Thomas Watson v. Commissioner.
Watson v. Commissioner
Docket No. 110793.
United States Tax Court
1943 Tax Ct. Memo LEXIS 95; 2 T.C.M. (CCH) 863; T.C.M. (RIA) 43441; September 30, 1943
*95 1. Held, that a check of the Paden City Pottery Co. for $233.25 was constructively received by petitioner in December 1935 when delivered to his duly authorized agent and endorsed by him for use by the company but not used by the holder until February 1936, the Pottery Co. having had sufficient funds to pay the check. 2. Interest credited to the open account of petitioner on the books of a corporation of which he was a stockholder and with whose president, a relative by marriage, he was intimately associated in business matters, held, to have been constructively received, there being no evidence that such interest could not have been paid. 3. Held, that the plant of American Glass Works was purchased by petitioner as trustee and hence on subsequent sale no sums received therefrom were taxable to petitioner as his individual income. 4. Deduction for loss on operation of grape vineyard in 1937 allowed. Thomas Watson, 1914 Grant Bldg., Pittsburgh, Pa., pro se. J. Harrison Miller, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies of $750.46 and $3,397.35 in the petitioner's income taxes for the *96 years 1936 and 1937, respectively. The issues are: 1. The taxability in 1936 of the sum of $233.25, termed rental or interest, due on land trust certificates issued by the Paden City Pottery Company and represented by a check payable to the petitioner and, by his authority, endorsed and deposited in the company's bank account and credited to the petitioner on its books. As an alternative issue the petitioner suggests that such amount was constructively received in 1935. 2. The taxability of the sums of $1,425.68 in 1936 and $1,553.21 in 1937, representing interest on the Pottery Company's indebtedness to the petitioner, accrued on the company's books to his credit during the years 1936 and 1937, respectively. 3. Whether or not the sum of $5,700 paid by I. E. Goodman as a part of the purchase price of certain assets was received by and taxable to the petitioner in 1937 in his individual capacity or as a trustee for others. 4. The deductibility in 1937 of a loss of $2,500 by reason of the worthlessness of the stock of Evans Manor Land Company. 5. The deductibility in 1937 of a loss of $526.75 sustained in the operation of a vineyard. Findings of Fact The petitioner is an individual *97 residing in Pittsburgh, Pennsylvania, and engaged in the practice of law in that city. The petitioner owned certain land certificates secured by a debenture executed by the Paden City Pottery Company, hereinafter called Pottery, with the Union Bank of Sistersville, West Virginia, as trustee. Pottery was required to pay thereon quarterly amounts termed "rentals." Pottery had not been operated profitably and its working capital had been inadequate. On March 20, 1930 the petitioner wrote to Charles S. Ray, president of Pottery, as follows: * * *
It is entirely satisfactory to me to have you use the rental checks from my certificates for the purpose of buying a new mangle or other necessary equipment, giving me credit for the rentals, and issuing me additional Land Trust Certificates therefor. If you desire the rental checks endorsed, you may send them to me and I will endorse and deposit them in my own bank account and send you my check for an equal amount, or you may use the rental checks if you desire and credit me with the amount thereof, applicable to the purchase of additional certificates. The other owners of the trust certificates had executed similar papers. On February *98 21, 1936 all the stockholders of Pottery, including the petitioner, entered into a written agreement to reorganize it in order to give it a better credit standing. The plan contemplated that the stockholders would convert their claims against Pottery for moneys advanced to Pottery into shares of its capital stock of various classes. Under this agreement all past and future interest upon indebtedness to the stockholders for advances and rentals upon the certificates held by the stockholders were to be converted into third preferred stock, but the unpaid balance of personal advances made since May 1, 1935, for working capital, was to be carried as an account payable not to be "funded in land trust certificates" but repaid as Pottery was able. The agreement was not carried out until 1940 and then not fully. Prior to December 16, 1935 Pottery deposited with the trustee sufficient money to pay the installment of rental due December 16, 1935 on the certificates. On December 16, 1935 the trustee issued its check (out of the money deposited with the trustee by Pottery) to the order of the petitioner for $233.25, being the amount of rental due at that date on the certificates owned by the *99 petitioner. On or about December 16, 1935 this check was delivered to Charles S. Ray, president of Pottery, who endorsed the petitioner's name thereon, pursuant to the authority given to him by the petitioner, and the check was deposited in the checking account of Pottery. On February 28, 1936 an entry was made on Pottery's books, crediting the petitioner's loan account with the amount of $233.25 as "interest." Neither the trustee's check for $233.25 dated December 16, 1935 nor the money it represented came into the petitioner's possession during 1935. The check was available for use in December 1935 and could have been cashed if presented. On December 28, 1936 Pottery entered as a credit on the petitioner's loan account the sum of $1,425.68, representing interest at 6 per cent accrued on the credit balance of that account during 1936. On December 30, 1937 a similar entry of $1,553.21 was made on Pottery's books, representing the interest accrued on the account during 1937. Such amounts were added to the petitioner's account and became the basis of interest accruals in subsequent years. Pottery did not have sufficient cash with which to carry on its business and also pay interest *100 on its indebtedness to the holders of its land trust certificates. The cash appearing on its balance sheets on December 31 in each of the years 1935, 1936 and 1937 was required to meet the payroll due January 6 of the following respective years. In his notice of deficiency the Commissioner determined that the petitioner received additional income from Pottery in the above amounts of $233.25 and $1,425.68 in 1936 and $1,553.21 in 1937. On August 3, 1936 Charles S. Ray and W. J. Brennan, special commissioners appointed by the Circuit Court of Wetzel County, West Virginia, to sell the real estate, plant and equipment of the American Glass Works, Inc. (hereinafter called American), Paden City, West Virginia, at public auction, executed their deed to the petitioner as the purchaser of the assets of American. The deed recited a consideration of $8,600. It was recorded on October 2, 1936 in the office of the Clerk of the County Court of Wetzel County, West Virginia. The purchase price was $8,600, paid by check of the Estate of James P. Watson, hereinafter called the Estate. The following persons paid to the Estate the amounts indicated and acquired participating interests to that extent *101 in the assets conveyed to the petitioner by the deed of special commissioners: W. J. McCoy
$ 390.92
C. E. Schupbach
78.20
J. J. McKay
78.20
L. B. Snyder
156.40
S. W. Fisher
265.73
James P. Watson Estate
7,630.55
On September 10, 1936 the petitioner executed a declaration of trust, stating that he had acquired the real estate, buildings and equipment of American, without beneficiary interest to himself and as trustee for the said persons. The declaration of trust was duly recorded in Wetzel County, West Virginia (in which the plant of American was located) on September 11, 1936. After the recording of the declaration of trust it remained continuously in the possession of Charles S. Ray until the day of trial, when it was filed in this case as an exhibit. The petitioner paid no part of his own money for the purchase of the American assets. He had no interest in that purchase except as a beneficiary of the Estate. On or about February 11, 1937 I. E. Goodman of Detroit, Michigan, went to Paden City, West Virginia, and inspected the glass plant formerly owned by American. He was shown through the plant by Charles S. Ray. On February 11, 1937 Goodman and Ray met the petitioner *102 in his office in Pittsburgh, and Goodman opened negotiations with the petitioner for the acquisition of certain of the machinery and equipment at the glass plant. The petitioner stated to Goodman that the petitioner was acting as trustee in the matter. The negotiations eventuated in a written agreement between the petitioner and Goodman dated February 11, 1937. Before the petitioner executed the agreement he telephoned certain of the beneficiaries (other than the J. P. Watson Estate, which was represented by Ray and the petitioner) and obtained their consent and approval to the agreement. Ray witnessed the petitioner's signature to the agreement. The following is an excerpt from the agreement between the petitioner and Goodman: Goodman will buy the said items, and in consideration therefor will pay a total sum of Twenty-Six thousand, five hundred dollars ($26,500.00), of which Thirteen Hundred dollars ($1,300.00) is to be paid for the repair parts purchased by Watson independently of said judicial sale and available for use with said bottle making machinery. This sale shall include title to the power wiring, but not the lighting wires. The balance of $25,200.00 is to represent the *103 residue of the sales price of said items of personal property which were acquired by Watson at judicial sale. The petitioner paid $1,412 for the repair parts which were priced at $1,300. Such payment was made in two checks of $706 each, payable to the Lynch Corporation, the manufacturer thereof. Goodman made the following payments to the petitioner, for which the petitioner gave Goodman credit as follows on the stub of the petitioner's check book: February 11, 1937, I. E. Goodman, hand money from sale machinery of American Glass Works of Paden City, $1,500. March 10, 1937, I. E. Goodman, payment on account of purchase of certain assets formerly owned by American Glass Works, Inc. of Paden City, $1,500.00. March 31, 1937, I. E. Goodman, on account of purchase of certain personal property of American Glass Works, Paden City, $2,500.00. April 13, 1937, I. E. Goodman, payment on account of purchase price of certain personal property formerly owned by American Glass Works of Paden City, $1,500. The money received from Goodman was deposited by the petitioner in his personal account in The Colonial Trust Company, Pittsburgh, Pennsylvania. Prior to the purchase from the special commissioners *104 the petitioner consulted with the contributors to the original payment of $8,600, and kept them apprised of the payments received from Goodman. After his payment of $1,500 on April 13, 1937 Goodman defaulted in all further payments. On January 13, 20 and 22, 1938 Goodman wrote to the petitioner, setting forth his plans for disposing of the American plant and asking for terms. On January 21, 1938 the petitioner replied to Goodman, stating that he had prospective purchasers of American, and refused to quote Goodman a price. On January 24, 1938 the petitioner informed Goodman as follows: * * * Unless payment is received by us from you within three days, we will take steps to sell the real estate, plant and the equipment, either as a unit or as separate items, whenever we can get a satisfactory price. The equipment will be sold for your account and we will credit your indebtedness to us with the amount realized from the equipment, looking to you for the payment of any deficiency. * * *
On several occasions subsequent to January 24, 1938 the petitioner told Goodman personally that efforts were being made to sell the property for Goodman's account. The petitioner attempted to sell *105 it to ten or more potential purchasers of all or parts of the plant, but he was not successful in doing so. Finally, on November 16, 1940, the petitioner leased the plant to Erwin H. Geiger, with an option to buy. The lease was made with the consent of the beneficiaries who joined in its execution. Thereupon the petitioner opened a trustee bank account for the deposit of rentals received under the lease. Toward the end of 1941 Ray and the petitioner prepared an account showing the receipt of $5,700 paid by Goodman, less the $1,412 advanced by the petitioner for repairs and certain expenses, making a net amount of $4,200 received from the Goodman sale. Another item of $900 representing rent was included in the account. Taxes and other expenses were deducted, and by checks dated December 30, 1941 the petitioner distributed the balance to the beneficiaries. The Estate's share of the distribution was $4,144.19, which was credited against advances made by the petitioner to the Estate. The rentals received by the petitioner during 1942 were deposited by him in the trustee account. In December of that year the petitioner wrote an explanatory letter to each beneficiary, enclosing a check *106 to cover his portion of the distribution therein described. On December 30, 1941 the petitioner as trustee filed an income tax return for the year 1937, showing the receipt of the $5,700 from Goodman. The return was filed with a representative of the Bureau of Internal Revenue. The petitioner filed tax returns as trustee for the years 1941 and 1942. The Commissioner determined that the payments in the amount of $5,700, received by the petitioner individually or as a trustee on the agreement of sale of the American plant and forfeited by the purchaser by default, constituted taxable income to the petitioner for 1937. On October 1, 1921 the petitioner entered into an agreement for the purchase of a tract of approximately 1,040 acres of land in North Union Township, Fayette County, Pennsylvania, called the Evans property or farm. On January 4, 1923 the petitioner executed a declaration of trust in favor of the Hecla Coal & Coke Company, hereinafter called Hecla, which had supplied the petitioner with the funds with which to make the cash and other payments required under the purchase agreement. Title was taken in the petitioner's name for convenience pending the organization of a *107 corporation to which the title was to be conveyed. The petitioner and Hecla were to own the stock in equal proportions. Under dates of January 5 and 30, 1923 the petitioner wrote to Ray (co-executor of and co-residuary legatee in the Estate), describing the transaction relating to the purchase of the Evans farm. The Sewickley seam of coal under the farm was leased to and was being operated by the Evans Coal & Coke Co., hereinafter called Evans Coal, in which the Estate owned a one-fourth interest. The petitioner offered Evans Coal the right to acquire the Evans farm, but that company declined to do so. In the letter of January 5, 1923 the petitioner offered the Estate a one-fourth interest in the Evans property. In the letter of January 30, 1923 the petitioner again expressed his willingness to permit the Estate to carry the said one-fourth interest. He enclosed a copy of a letter from the president of Hecla to its secretary, setting forth the fact that the Evans property was being taken over by a new corporation, Evans Manor Land Co., hereinafter called Manor, and reciting the terms of the transaction. The letter also stated that Hecla and the petitioner were to own Manor stock *108 in equal proportions. In a footnote to that letter Ray declined to approve any investment by the Estate in the Manor enterprise and acquiesced in the petitioner's treatment of the purchase as an individual transaction. Subsequent to Ray's decision not to participate in the Manor venture the Estate purchased no interest in Manor stock. The petitioner and his wife executed the deed conveying the Evans property to Manor. Attached to the deed was an affidavit stating that the title to the property was taken in the petitioner's name for the benefit of Manor, the equitable owner, which paid the consideration therefor. On June 20, 1923 Manor issued to the petitioner its certificate for 50 shares of its capital stock. On June 28, 1923 the petitioner agreed to sell to Johnston & Means certain real estate in Fayette County, Pennsylvania. He was to receive $1,000 for the land, less a commission of $50 for the sale. He assigned his rights in the contract to Manor. On July 28, 1929 Manor billed the petitioner for $2,189.32, representing the balance due on his stock subscription. The amount was arrived at by charging him $2,500 for the stock subscribed for and $639.32 as interest thereon and allowing *109 him a credit for the $950 above mentioned. On the same day the petitioner issued his check to Manor for $2,189.32. It was paid by the bank on the next day. Appropriate entries on Manor's books showed the payment to that company. On December 15, 1937 all stockholders of Evans Manor Land Co. executed an instrument which was filed with the Secretary of State of the Commonwealth of Pennsylvania, consenting to the dissolution of the corporation. In this instrument petitioner is shown as the owner of 50 shares of the capital stock of the corporation. The J. P. Watson Estate is not shown as the owner of any stock of the corporation. Hecla is shown as the owner of 46 shares and four other shareholders appeared as owning one share each. On December 27, 1937 Manor entered into a written agreement with its creditors providing for the pro rata distribution of its assets among them. Its total assets were $165,302.23 and its total liabilities were $527,971.19, the creditors receiving.31308948 per cent of their claims. No surplus remained for the stockholders. On December 31, 1937 the Secretary of State of Pennsylvania issued his certificate of dissolution of Manor. Petitioner, as an attorney *110 at law, prepared and signed the protest of J. H. Hillman & Sons Company to the revenue agent's report in its tax case for the years 1936 and 1937 which bore the following "Statement of Attorneys": The foregoing protest was prepared by the undersigned from the books and records of the taxpayer and information furnished by the officers, and the facts stated are believed to be true and correct. One of the items against which J. H. Hillman & Sons Company protested was a bad debt loss representing money advanced by that company to Manor. The revenue agent took the position that the loans constituted a capital contribution. The taxpayer protested against this, stating inter alia: (a) The taxpayer never owned any stock of Evans Manor Land Company. The stock was owned 50% by Hecla Coal & Coke Company and 50% by the James P. Watson Estate. Loans were made by this taxpayer and Hecla Coal & Coke Company, but no loans were made by the James P. Watson Estate. By an amendment to his petition the petitioner claimed a loss of $2,500 in 1937 due to the worthlessness of his Manor stock. The respondent's answer denied the allegation of the amendment. In 1937 the petitioner owned a tract of *111 land in Lake County, Ohio, fronting on Lake Erie and containing 19 or more acres. He purchased it in 1936. Thirteen acres of the land were under cultivation. On the rear of the land was a vineyard of about 8 acres. The vines were seven or eight years old and were bearing. The petitioner proceeded to raise a crop of grapes. He employed expert assistants and additional common labor. He expended a total sum of $561.75 for such services. The vineyard produced between 20 and 40 tons of grapes in 1937. The crop of grapes in the neighborhood was unusually good. There was no winery or grape juice plant in the vicinity. Consequently, the grapes of the petitioner and his neighbors could not be marketed and rotted on the vines. The petitioner received $35 for such grapes as he could sell. In his notice of deficiency the Commissioner disallowed the loss as the result of the petitioner's operation of a vineyard on the ground that the farm was not operated as a business enterprise but was acquired for the purpose of a summer and weekend resort. The petitioner's income taxes for the returns for 1936 and 1937 were made on the basis of cash receipts and disbursements. Opinion VAN FOSSAN, Judge: *112 The first issue raises the question whether or not the sum of $233.25 covered by Pottery's check of December 16, 1935 is taxable to the petitioner in 1936. The facts are undisputed and clear. The petitioner authorized Ray to endorse his name to Pottery's rental checks. The check in controversy was issued by Pottery on December 16, 1935, delivered to Ray and endorsed by him. It was deposited in Pottery's checking account on a date not disclosed in the record. On February 29, 1936 an appropriate entry was made on Pottery's books crediting the petitioner's loan account with the amount of the check. On December 16, 1935 the check could have been cashed. On these facts it is apparent that on December 16, 1935 constructive, if not actual, payment was made to the petitioner. His duly constituted agent Ray received the check and endorsed it pursuant to authority granted by the petitioner. Ray's acts were the acts of his principal. See W. P. Henritze, 41 B.T.A. 505, and cases there cited. However, the petitioner's alternative contention is sustained. He received and endorsed the controverted check for $233.25 in December 1935 and hence such sum was income *113 to petitioner in 1935. In the second issue the petitioner seeks to exclude from his income the sums of $1,425.68 and $1,553.21 representing interest on Pottery's indebtedness to him as it appeared in the petitioner's "loan account" on Pottery's books at the end of the years 1936 and 1937, respectively. The petitioner argues that these sums were not made available to him, were never brought within his own control and disposition and therefore were not proper items of income. The respondent's position is that since the petitioner and Ray were in complete control of Pottery the petitioner could either withdraw his interest on his loan account with Pottery or could leave it with Pottery as an additional loan on which he would receive further interest. In the stockholders' agreement of February 21, 1936, holders of land trust certificates and the creditors on open account were placed in different categories. The former agreed to accept first preferred stock for unpaid rentals or other such advances, while Pottery's debts to the latter, the creditors, were to be carried as accounts payable and not to be paid by third preferred stock. The interest on the petitioner's open or loan *114 account falls within the second class. At least it was so treated on Pottery's books, and we have no evidence that it was considered otherwise. There is testimony that Pottery could not pay the interest or rentals on its land trust certificates but there is no definite proof that these particular open account items of $1,425.68 and $1,553.21 could not have been paid. In Albert J. Sullivan, 16 B.T.A. 1347, we held that interest credited on the books of the corporation to the personal account of its stockholder was constructively received by him, the financial condition of the debtor corporation being such that the amounts credited could have been paid. In the case at bar, in the absence of evidence that the items in question could not have been paid, we must apply the principle set forth in the Sullivan case and hold that the petitioner's election to deposit in Pottery the interest due to him and accrued to him on Pottery's books, thus to enjoy the advantages of compounding interest, is an essential element of income, John A. Brander, 3 B.T.A. 231, and renders the sums of $1,425.68 and $1,553.21 taxable to him in *115 the years 1936 and 1937, respectively. Alexander Zolotoff, 41 B.T.A. 991. The third issue presents a simple question of fact. In purchasing the assets and plant of American did the petitioner act in his individual capacity, as asserted by the respondent, or as a trustee for a group of purchasers? If he acted as a trustee the amounts paid to him by Goodman upon the purchase of such assets and plant were not includible in his own income. The record shows unmistakably that the petitioner made the purchase as a trustee. If the testimony was not sufficient, the formal declaration of trust, duly executed and recorded months before the transaction with American, would clearly support the petitioner's contention. While the petitioner's methods of bookkeeping were inadequate, the record here is clear and convincing. The $5,700 received by the petitioner from Goodman was the property of the persons for whom he acted as trustee. Out of that sum he repaid $1,412 advanced by himself for repairs and $80 as expenses incurred by him. The remainder he distributed to the beneficiaries of the trust. The taxability of the amounts so distributed is not before us. The *116 petitioner was not one of the beneficiaries of the trust. The record relating to the fourth issue is too confusing to enable us to arrive at any definite judgment. The petitioner claims that in 1923 he purchased Manor stock in his individual capacity, that in December 1937 Manor made a distribution of its assets to its creditors, with no surplus for the stockholders, and that thereupon it was dissolved. However, in the protest of the J. H. Hillman & Sons Company, signed by the petitioner as its attorney, the statement appears that Manor stock was owned equally by Hecla and the Estate. The transactions between the petitioner and the Estate were very loosely and informally conducted, but this direct contradiction cannot be overlooked. Petitioner cannot complain if the statement previously made by him about a matter presently on inquiry rise to plague him, nor has he cause for grievance if the statement so made be held to discount and counter-balance the weight and credence presently to be given to his assertions as to what is the truth of the matter. In such a situation where the evidence is in a state of equipoise and no means of determining the truth suggests itself, it cannot be *117 said that the petitioner has successfully carried his burden of proof. Furthermore, there is no proper proof that the stock became worthless in 1937. Judging from the history of the corporation and its operation, the stock may well have been worthless long before that year. We sustain the respondent in this issue. The fifth and last issue is the deductibility of $526.75 alleged to have been sustained as a loss in the production of a crop of grapes on a small farm owned by the petitioner. In 1936 the petitioner purchased a 19-acre tract of land fronting on Lake Erie. Thirteen acres thereof were under cultivation and 8 acres were planted in grapes. The petitioner expended $561.75 in cultivating and caring for the grape vines in order to obtain a commercial production therefrom. Due to the prolitic crop in 1937 he could sell only $35 worth of grapes and thus suffered a loss of $526.75. The respondent argues that the production of the grapes was incidental to the petitioner's use of the land as a summer home. He also challenges the meager records offered in support of the petitioner's claim. Checks covering the expenditures were submitted in evidence, and other testimony corroborated *118 and explained the sums so expended. The production of from 25 to 40 tons of grapes is scarcely an activity incidental to the maintenance of a weekend or summer home. We believe that the petitioner was engaged in the grape production for profit and is entitled to the deduction claim. We so hold. Decision will be entered under Rule 50.